# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on March 16, 2023**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.** |
| | : | |
| v. | : | **Grand Jury Original** |
| | : | |
| MYONG HO RI, | : | **VIOLATIONS:** |
| | : | |
| Defendant. | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| | : | |
| | : | **50 U.S.C. § 1705** |
| | : | **(International Emergency Economic** |
| | : | **Powers Act)** |
| | : | |
| | : | **18 U.S.C. § 1344** |
| | : | **(Bank Fraud)** |
| | : | |
| | : | **18 U.S.C. § 1956(a)(2)(A)** |
| | : | **(International Money Laundering)** |
| | : | |

## I N D I C T M E N T

The Grand Jury charges that:

At times material to this Indictment:

### The Defendant and Other Individuals and Entities

1.      Defendant MYONG HO RI (hereinafter referred to as "RI"), is a citizen of the Democratic People's Republic of Korea ("North Korea" or "DPRK") who served as a diplomat, specifically the "Third Economic and Commercial Secretary," in the Embassy of North Korea in Bangkok, Thailand.

1

2.      FOREIGN COMPANY 1 was a company with a public address in Pyongyang, North Korea. The United Nations Security Council previously identified FOREIGN COMPANY 1 as a company involved in smuggling goods into North Korea.

3.      RI has been publicly listed as a contact for FOREIGN COMPANY 1 in Bangkok, Thailand.

4.      FOREIGN COMPANY 2 is a sugar supplier based in Bangkok, Thailand. FOREIGN COMPANY 2 maintained bank accounts in Thailand and Singapore.

5.      FOREIGN COMPANY 3 is a North Korean company that, according to a United Nations Panel of Experts report, was "actively involved in the facilitation of [a] joint venture" with a Chinese company "for the purpose of evading sanctions."

6.      FOREIGN COMPANY 4 is a North Korean company that "[e]xports and imports equipment for [the DPRK] armed forces," according to a public report issued by the U.S. Central Intelligence Agency.

7.      FOREIGN COMPANY 5 is a North Korean company that the United Nations Security Council has identified as having been used by the DPRK Munitions Industry Department for revenue generation and that was "involved in procurement for the nuclear programme of the [DPRK]."

8.      CO-CONSPIRATOR 1 is the director of FOREIGN COMPANY 2.

9.      U.S. BANKS 1-4 are financial institutions headquartered in the United States that acted as correspondent banks to facilitate wire transfers involving U.S. dollars.

10.     The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), administers and enforces economic and trade sanctions in support of U.S. national

2

security and foreign policy objectives. OFAC was located in the District of Columbia at all times relevant to this indictment.

### The International Emergency Economic Powers Act and the North Korea Sanctions Regulations

11.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorizes the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with North Korea.

12.     Using the powers conferred by IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities suspected of proliferating Weapons of Mass Destruction ("WMD"). On November 14, 1994, the President issued Executive Order ("EO") 12,938, finding "that the proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

13.     On June 28, 2005, the President, in order to take additional steps with respect to the national emergency described and declared in EO 12,938, issued EO 13,382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") targeting proliferators of WMD and their support networks and seeking to deny designated proliferators

access to the U.S. financial and commercial systems. EO 13,382 authorized the Secretary of the

Treasury, in consultation with the Secretary of State, "to take such actions, including the

promulgation of rules and regulations, as may be necessary to carry out the purposes" of the EO.

Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the

"Weapons of Mass Destruction Proliferators Sanctions Regulations."   *See* 31 C.F.R. § 544.101

*et seq.*

14.     On June 26, 2008, the President again declared a national emergency with respect

to the DPRK under IEEPA with EO 13,466, which addressed the unusual and extraordinary

threat to the United States posed by the "risk of the proliferation of weapons-usable fissile

material on the Korean Peninsula."

15.     On August 30, 2010 the U.S. Department of State designated the Munitions

Industry Department ("MID") pursuant to EO 13,338 "for its involvement with or provision of

support for the DPRK's weapons of mass destruction programs, including the development of

ballistic missiles."

16.     On September 1, 2010, the President issued EO 13,551 in response to an

unprovoked North Korean attack on a South Korean ship that led to the deaths of 46 sailors, as

well as the DPRK's continued nuclear weapons activity, violations of United Nations Security

Council resolutions, and "illicit and deceptive activities in international markets through which it

obtains financial and other support." EO 13,551 "expand[ed] the scope of the national

emergency declared in [EO] 13[,]466" and prohibited "money laundering . . . or other illicit

economic activity that involves or supports the Government of North Korea or any senior official

thereof."

4

17.     On November 4, 2010, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations" pursuant to EO 13,466 and EO 13,551. *See* 31 C.F.R. § 510.101 *et seq*.

18.     On April 18, 2011, the President issued EO 13,570 to take additional steps to address the national emergency declared in EO 13,466, including by ensuring the implementation of import restrictions imposed by United Nations Security Council resolutions and to complement import restrictions imposed by the Arms Export Control Act.

19.     On January 2, 2015, the President issued EO 13,687 in response to the DPRK's "coercive cyber-related actions," continued violation of United Nationals Security Council resolutions, and "commission of serious human rights abuses."  EO 13,687 prohibited "the importation into the United States, directly or indirectly, of any goods, services, or technology from North Korea."

20.     On March 15, 2016, the President issued Executive Order 13,722 to address the Government of North Korea's continuing pursuit of its nuclear and missile programs.

21.     On September 20, 2017, the President issued EO 13,810 imposing additional sanctions on North Korea in response to its continued nuclear testing, commission of serious human rights abuses, and "use of funds generated through international trade to support its nuclear and missile programs and weapons proliferation."

22.     Pursuant to the authority of EO 13,687, EO 13,772, and EO 13,810, on March 5, 2018, the Secretary of the Treasury   amended the North Korea Sanctions Regulations and reissued them in their entirety *See* 31 C.F.R. § 510.101 *et seq*. Executive Order 13,722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United

5

States or by any U.S. person, wherever located, to North Korea, unless exempt or authorized by OFAC, which is located in Washington, D.C.

23.     Foreign financial institutions maintain U.S. dollar bank accounts at banks in the United States ("correspondent banks"). Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

24.     The North Korea Sanctions Regulations prohibited the export of financial services, to include correspondent banking activities, by any U.S. person. *See* 31 C.F.R. § 510.101 *et seq.*

25.     The North Korea Sanctions Regulations defined "U.S. person" as any:

    a.     United States citizen or permanent resident alien;

    b.     entity organized under the laws of the United States or any jurisdiction within the United States, including foreign branches; or,

    c.     person in the United States.

*See* 31 C.F.R. § 510.326

26.     The North Korea Sanctions Regulations also prohibited activities that evaded or

avoided, or had the purpose of evading or avoiding, any prohibition set forth in these regulations. *See* 31 C.F.R. § 510.212.

### Bank Secrecy Act

27.     According to the U.S. Department of the Treasury, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with anti-money laundering and countering the financing of terrorism requirements set forth in the Bank Secrecy Act ("BSA"), as well as sanctions programs administered by OFAC. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the BSA in furtherance of its mission to safeguard the U.S. financial system.

28.     Nearly all U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of U.S. dollar transactions.

29.     The Bank Secrecy Act broadly defines foreign financial institutions to include dealers of foreign exchange and money transmitters in a manner not merely incidental to their business.

30.     Section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A as part of the Bank Secrecy Act, gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. A Section 311 finding and the related special measures are implemented through various orders and regulations. In order to protect the integrity of the U.S. financial system, a special measure imposed under

Section 311 prevents financial institutions from causing U.S. financial institutions from engaging in any type of financial transaction with an entity within the jurisdiction deemed an area of money laundering concern.

31.    In June 2016, FinCEN made a Section 311 finding against North Korea. Specifically, FinCEN's finding deemed the entire North Korean financial sector as a jurisdiction of primary money laundering concern.

32.    In November 2016, FinCEN implemented the most severe special measure against the entire North Korean financial sector. Federal Register, Vol. 81, No. 217 (Nov. 9, 2016); 31 C.F.R. § 1010.659. The special measure bars U.S. financial institutions from maintaining a correspondent account for any North Korean financial institution or any party acting on its behalf.

33.    The special measure also requires U.S. financial institutions to exercise enhanced due diligence and take reasonable steps to not process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involves a North Korean financial institution. FinCEN cut all North Korean financial institutions—and entities acting on their behalf—off from any trade in U.S. dollar transactions via correspondent banking.

34.    A violation of the Section 311 finding, codified at 31 U.S.C. § 5318A, or of the regulations published at 31 C.F.R. § 1010.659, is punishable criminally pursuant to 31 U.S.C. § 5322.

## COUNT ONE

**(Conspiracy to Defraud the United States and to Violate IEEPA)**

## THE CONSPIRACY

8

35.     Beginning in or about February 2015, and continuing through in or about February 2019, Defendant RI did willfully combine, conspire, and agree with others known and unknown to the Grand Jury, (a) to defraud the United States by interfering and obstructing a lawful function of the government, that is, the enforcement of the North Korea Sanctions Regulations, 31 C.F.R. §§ 510.101, *et seq.*, by deceit, craft, trickery, and dishonest means, and (b) to violate, evade, and avoid the restrictions imposed by OFAC under the North Korea Sanctions Regulations, 31 C.F.R. §§ 510.101, *et seq.*, by causing the provision of financial services through the U.S. financial system for the benefit of the DPRK without first having obtained a license from OFAC in violation of Title 50, United States Code, Section 1705.

36.     The conduct alleged in this Count occurred within the District of Columbia and elsewhere and is therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Sections 3237(a).

### Knowledge

37.     As early as February 2015, RI was aware of the North Korean sanctions regime in place. RI received a warning from a Chinese shipping company on or about February 13, 2015, that North Korea was "under u.s. sanction."   A Malaysian company warned RI in an email from on or about December 1, 2015, that they could not deliver directly to North Korea "[d]ue to sanction issue[.]"   On or about June 7, 2017, RI informed a co-conspirator that a pending export to North Korea was cancelled. He subsequently requested to rebook the shipment, but directed the co-conspirator to "NOT [mention] INTRANSIT [sic] AT NORTH KOREA."

### OBJECTS OF THE CONSPIRACY

38.     The goals of the conspiracy were:

9

      a.      to acquire goods from Thailand in order to supply those goods to North Korea;

      b.      to evade the regulations, prohibitions, and licensing requirements of IEEPA, Executive Order 13,722, and the North Korean Sanctions Regulations, 31 C.F.R. § 510.212; and

      c.      to make a financial profit for the defendant and his co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

39.     The manner and means by which the defendant and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

      a.      While serving as the Third Economic and Commercial Secretary in the Embassy of North Korea in Thailand, RI negotiated contracts on behalf of FOREIGN COMPANY 1 with FOREIGN COMPANY 2 to ship goods from Thailand to North Korea, including for the benefit of North Korean companies sanctioned by the U.S. Department of State and associated with nuclear procurement or importing goods for the DPRK armed forces.

      b.      RI facilitated U.S. dollar payments to FOREIGN COMPANY 2 using several different front companies in order to conceal any nexus to North Korea. He never made a payment in his name or that of FOREIGN COMPANY 1.

      c.      RI's co-conspirators intentionally concealed from banking institutions located in the United States the true nature of the ultimate end use and the true identities of the ultimate end users of the goods. Specifically, CO-CONSPIRATOR 1 provided false and misleading information about the ultimate destination of the goods.

10

d.      Neither RI nor any of the co-conspirators applied for a license from the United States government to provide goods or services to North Korea.

## OVERT ACTS

40.      In furtherance of the above-described conspiracy, and in order to carry out the object thereof, the defendant and others known and unknown to the Grand Jury committed and caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

a.      On or about August 4, 2017, RI received a bill of lading for a shipment of five thousand bags of "Thailand Refined Sugar" to Nampo, DPRK, with the consignee listed as FOREIGN COMPANY 3.

b.      On or about August 22, 2018, RI executed a contract between FOREIGN COMPANY 1 and FOREIGN COMPANY 2 for the delivery of 150 metric tons of sugar from Thailand to Nampo, North Korea. The contract specified payment by wire ("T/T") to FOREIGN COMPANY 2, and FOREIGN COMPANY 2 communicated to RI that payment could be made to either FOREIGN COMPANY 2's bank account in Thailand or FOREIGN COMPANY 2's bank account in Singapore.

c.      From on or about August 27, 2018, until on or about September 7, 2018, FOREIGN COMPANY 2's bank account in Singapore received approximately $342,800 in U.S. dollar wire transfers. These payments were directed by RI and co-conspirators acting on behalf of the Government of North Korea.

d.      From on or about August 28, 2018, until on or about November 2, 2018, FOREIGN COMPANY 2's bank account in Thailand received approximately $515,100

11

in U.S. dollar wire transfers. These payments were directed by RI and co-conspirators acting on behalf of the Government of North Korea.

e.     On or about November 14, 2018, Ri received a bill of lading for a shipment of ten thousand bags of "Thailand Refined Sugar" to Nampo, DPRK, with the consignee listed as FOREIGN COMPANY 4.

f.     In or around December 20, 2018, RI received a bill of lading for twenty thousand bags of "Thailand Refined Sugar" to Nampo, DPRK, with the consignee listed as FOREIGN COMPANY 5.

g.     In or around January 2019, U.S. BANK 1 sent an inquiry to FOREIGN COMPANY 2's bank, which stated, "[p]rovide detailed purpose of payment;" and "[d]isclose any North Korean involvement or the involvement of any sanctioned designated entities/individuals," related to a requested $335,000 payment. FOREIGN COMPANY 2's bank forwarded this request to CO-CONSPIRATOR 1 at FOREIGN COMPANY 2, who in turn forwarded the request to RI.

h.     CO-CONSPIRATOR 1, as the director of FOREIGN COMPANY 2, falsely responded to the inquiry that she did not do business with North Korea. On or about January 30, 2019, CO-CONSPIRATOR 1 communicated with RI. The two agreed that, for future payments, CO-CONSPIRATOR 1 should travel to North Korea for the purpose of receiving cash.

i.     RI made four additional payments to FOREIGN COMPANY 2, totaling approximately $1,930,000, which RI made in cash between around October 2018 through November 2018.

12

j.        Between in or around October and December 2018, FOREIGN

COMPANY 2, RI, and a shipping company exchanged bills of lading, packing lists, and

other shipping documents, for shipments of products from Thailand to Dalian, China,

which is a port frequently used by North Korea to ship goods into and out of the country.

k.        On or about November 14, 2018, and December 20, 2018, a shipping

company sent RI bills of lading revealing shipments from Dailan, China to the port of

Nampo in North Korea. The contents were described as "Thailand Refined Sugar."

### Failure to Obtain Required Licenses

41.        The defendant and his co-conspirators failed to obtain and possess, and caused

others to fail to obtain and possess, one or more license(s) from OFAC, which is located in the

District of Columbia, to export the financial services described above from the United States to

North Korea.

**(Conspiracy to Defraud the United States and to violate IEEPA,** in violation of Title

18, United States Code, Section 371; and Title 50, United States Code, Section 1705)

### COUNT TWO

### (Conspiracy to Commit Bank Fraud)

The allegations in Count One are hereby incorporated and re-alleged as if set forth here in full.

### OBJECTS OF THE CONSPIRACY

42.        The goals of the conspiracy were:

a.        to acquire goods from Thailand in order to supply those goods to North

Korea;

b.        to conceal from United States banking institutions that payments wired to

13

the suppliers of goods were made on behalf of customers in North Korea;

      c.      to evade the regulations and reporting requirements of the Bank Secrecy Act; and,

      d.      to make a financial profit for the defendant and his co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

43.    The manner and means by which the defendant and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

      a.      While serving as the Third Economic and Commercial Secretary in the Embassy of North Korea in Thailand, RI negotiated contracts on behalf of FOREIGN COMPANY 1 with FOREIGN COMPANY 2 to ship goods from Thailand to North Korea, including for the benefit of North Korean companies sanctioned by the U.S. Department of State and associated with nuclear procurement or importing goods for the DPRK armed forces.

      b.      RI facilitated U.S. dollar payments to FOREIGN COMPANY 2 using several different front companies in order to conceal any nexus to North Korea. He never made a payment in his name or that of FOREIGN COMPANY 1.

      c.      RI's co-conspirators intentionally concealed from banking institutions located in the United States the true nature of the ultimate end use and the true identities of the ultimate end users of the goods. Specifically, CO-CONSPIRATOR 1 provided false and misleading information about the ultimate destination of the goods.

      d.      Neither RI nor any of the co-conspirators applied for a license from the United States government to provide goods or services to North Korea.

14

44.     Beginning in or about February 2015, and continuing through or about February

2019, Defendant RI and co-conspirators did willfully combine, conspire, and agree with others

known and unknown to the Grand Jury, to knowingly execute a scheme to defraud U.S. financial

institutions, including U.S. BANK 1, to obtain funds by means of false and fraudulent pretenses,

representations, and promises, that is, by concealing from a financial institution that financial

transactions were for the benefit of North Korea and North Korean entities.

45.     U.S. BANK 1 held a correspondent bank account used to facilitate U.S. dollar

wire transfers for transactions between FOREIGN COMPANY 2 and RI on behalf of FOREIGN

COMPANY 1.

46.     In or around January 2019, U.S. BANK 1 contacted FOREIGN COMPANY 2's

Singaporean bank for details about a $335,000 wire transfer. Specifically, U.S. BANK 1

requested disclosure of any involvement with North Korea or any sanctioned entities.

47.     FOREIGN COMPANY 2's bank sent this inquiry to FOREIGN COMPANY 2

and further noted that the inquiry was related to a correspondent bank in the United States.

48.     U.S. banks that process transactions barred by sanctions are subject to civil fines

under IEEPA, as well as other financial penalties. The risk of loss to U.S. banks from civil

liability, fines, or penalties may dissuade these institutions from processing transactions when a

U.S. bank knows of a customer's connections with a sanctioned entity.

49.     RI and CO-CONSPIRATOR 1 corresponded about U.S. BANK 1's request for

information. CO-CONSPIRATOR 1 then falsely told FOREIGN COMPANY 2's bank that she

did not do business with North Korea.

50.     FOREIGN COMPANY 2 received U.S. dollar wire payments through its bank in

15

Thailand. RI arranged such payments to appear to originate from China in the names of front companies to further conceal the true origination in North Korea.

51.     FOREIGN COMPANY 2 received multiple inquiries from banks asking about any North Korean connections to payments. FOREIGN COMPANY 2 falsely informed the banks that there was no such involvement.

**(Conspiracy to Commit Bank Fraud**, in violation of Title 18, United States Code, Section 1344; and Title 18 United States Code, Section 1349)

## COUNTS THREE THROUGH TWENTY

### (International Money Laundering)

52.     The allegations in Count One are incorporated and realleged as if set forth here in full.

53.     On or about the following dates, within the District of Columbia and elsewhere, Defendant RI transported, transmitted, and transferred a monetary instrument and funds from a place in the United States, namely correspondent bank accounts, to or through a place outside the United States, specifically, Thailand, Singapore, and North Korea, with the intent to promote the carrying on of a specified unlawful activity, *i.e.*, violations of 50 U.S.C. § 1705.

54.     Specifically, the transactions described in Counts Three through Twenty amount to approximately $858,039 in U.S. dollar wire transfers RI caused to be sent from intermediaries in China to FOREIGN COMPANY 2 using correspondent bank accounts in the United States.

> a.     **Count Three:**   On or about August 27, 2018, RI caused U.S. BANK 2, a bank within the United States, to send $59,988 from China to FOREIGN COMPANY 2's bank in Singapore, a bank outside the United States;

16

b.     **Count Four:**   On or about August 28, 2018, RI caused U.S. BANK 3, a

bank within the United States, to send $44,975 from China to FOREIGN

COMPANY 2's bank in Thailand, a bank outside the United States.

c.     **Count Five:**   On or about August 31, 2018, RI caused U.S. BANK 1, a

bank within the United States, to send $49,962 from China to FOREIGN

COMPANY 2's bank in Thailand, a bank outside the United States.

d.     **Count Six:**   On or about August 31, 2018, RI caused U.S. BANK 3, a

bank within the United States, to send $49,980 from China to FOREIGN

COMPANY 2's bank in Singapore, a bank outside the United States.

e.     **Count Seven:**   On or about August 31, 2018, RI caused U.S. BANK 1, a

bank within the United States, to send $41,980 to FOREIGN COMPANY

2's bank in Singapore, a bank outside the United States.

f.     **Count Eight:**   On or about August 31, 2018, RI caused U.S. BANK 1, a

bank within the United States, to transfer $49,975 from China to

FOREIGN COMPANY 2's bank in Singapore, a bank outside the United

States.

g.     **Count Nine:** On or about September 3, 2018, RI caused U.S. BANK 1, a

bank within the United States, to send $49,962 from China to FOREIGN

COMPANY 2's bank in Thailand, a bank outside the United States.

h.     **Count Ten:**   On or about September 3, 2018, RI caused U.S. BANK 4, a

bank within the United States, to send $44,970 from China to FOREIGN

COMPANY 2's bank in Thailand, a bank outside the United States.

17

i.      **Count Eleven**:  On or about September 4, 2018, RI caused U.S. BANK 3, a bank within the United States, to transfer $40,980 from China to FOREIGN COMPANY 2's bank in Singapore, a bank outside the United States.

j.      **Count Twelve**:  On or about September 5, 2018, RI caused U.S. BANK 3, a bank within the United States, to send $39,975 from China to FOREIGN COMPANY 2's bank in Thailand, a bank outside the United States.

k.      **Count Thirteen**:  On or about September 7, 2018, RI caused U.S. BANK 3, a bank within the United States, to send $49,980 from China to FOREIGN COMPANY 2's bank in Singapore, a bank outside the United States.

l.      **Count Fourteen**:  On or about September 7, 2018, RI caused U.S. BANK 4, a bank within the United States, to send $49,980 from China to FOREIGN COMPANY 2's bank in Singapore, a bank outside the United States.

m.      **Count Fifteen**:  On or about September 7, 2018, RI caused U.S. BANK 3, a bank within the United States, to send $49,975 from China to FOREIGN COMPANY 2's bank in Thailand, a bank outside the United States.

n.      **Count Sixteen**: On or about October 26, 2018, RI caused U.S. Bank 1, a bank within the United States, to send $49,962 to FOREIGN COMPANY

18

2's bank in Thailand, a bank outside the United States.

    o.    **Count Seventeen:** On or about October 29, 2018, RI caused U.S. Bank 3, a bank within the United States, to send $49,975 to FOREIGN COMPANY 2's bank in Thailand, a bank outside the United States.

    p.    **Count Eighteen:** On or about October 30, 2018, RI caused U.S. Bank 4, a bank within the United States, to send $47,970 to FOREIGN COMPANY 2's bank in Thailand, a bank outside the United States.

    q.    **Count Nineteen:** On or about October 31, 2018, RI caused U.S. Bank 3, a bank within the United States, to send $44,975 to FOREIGN COMPANY 2's bank in Thailand, a bank outside the United States.

    r.    **Count Twenty:** On or about November 1, 2018, RI caused U.S. Bank 3, a bank within the United States, to send $42,475 to FOREIGN COMPANY 2's bank in Thailand, a bank outside the United States.

55.    RI caused correspondent banks in the United States to transfer these wire payments to FOREIGN COMPANY 2's bank accounts in Singapore and Thailand while hiding North Korea's involvement.

(**International Money Laundering**, in violation of Title 18, United States Code, Section 1956(a)(2)(A))

## FORFEITURE ALLEGATION

56.    Upon conviction of any of the violations alleged in Counts One through Count Twenty of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these violations, pursuant to

19

Title 18, United States Code, Section 982(a)(2) & 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment against the defendant in an amount of at least $858,039, which represents a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these violations.

57.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

   a.   cannot be located upon the exercise of due diligence,

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the Court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property that cannot be subdivided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1); and Title 28, United States Code, Section 2461(c).

(Criminal Forfeiture, pursuant to Title 18, United States Code, Sections 982(a)(1) & (b)(1); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia

20